UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SAMORY GERMAN, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | No. 1:22-cv-02103-JMS-MKK |
| | ) | |
| ELI LILLY AND COMPANY, | ) | |
| | ) | |
| *Defendant.* | ) | |

**ORDER**

Defendant Eli Lilly and Company ("Lilly") terminated one of its former employees, Plaintiff Samory German, who is African American, after a company investigation determined that Mr. German continued to use a company vehicle without authorization to do so and returned it in disrepair. Mr. German then sued, claiming that Lilly unlawfully discriminated against him. Lilly has filed an Amended Motion for Summary Judgment ("Motion for Summary Judgment"), [Filing No. 59], which is ripe for the Court's review.

**I.**
**STANDARD OF REVIEW**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). "'Summary judgment is not a time to be coy.'" *King v. Ford Motor Co.*, 872 F.3d 833, 840 (7th Cir. 2017) (quoting *Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017)). Rather, at the summary judgment stage, "[t]he parties are required to put their evidentiary cards on the table." *Sommerfield*, 863 F.3d at 649.

1

The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

Each fact asserted in support of or in opposition to a motion for summary judgment must be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence." S.D. Ind. L.R. 56-1(e). And each "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence." *Id.* The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant. *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572-73 (7th Cir. 2017) (quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h). Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary judgment motion. Fed. R. Civ. P. 56(e)(2).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II.
### STATEMENT OF FACTS

The following Statement of Facts is set forth pursuant to the standard detailed above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### A. Lilly's Company Vehicles Fleet Policy

Lilly's company vehicles are managed by Element (the "Fleet Management Company"), which is the "principal point of contact for drivers . . . to resolve all vehicle related problems and make all vehicle related policy inquiries." [Filing No. 75 at 4-5 (citing Filing No. 61-1 at 4).] Lilly employees who are authorized to use company vehicles are required to abide by Lilly's Fleet Policy ("the Policy") [Filing No. 61-1.]

The Policy determines who is eligible for a company vehicle. It states that "Lilly Fleet Administration determines driver and vehicle eligibility criteria" and "[e]ligibility standards and vehicle assignments may be changed at the discretion of the company." [Filing No. 61-1 at 4.] Per the Policy, employees who have a company vehicle also have a company credit card for expenditures related to the vehicle. [*See* Filing No. 61-1 at 6; 10.] Although the credit card must be used for "all fuel[] and maintenance incurred in the . . . vehicle," it must not be used for "expenses for any vehicle not provided by" the Fleet Management Company. [Filing No. 61-1 at 6; 10.] The Policy also explains when an employee must return the company vehicle. It states that "[d]rivers who accept a new position that do not qualify for a company provided vehicle must return the company provided vehicle . . . no later than the effective state date of the new position," [Filing No. 61-1 at 7,] and the Fleet Management Company "will instruct the driver on how to

3

return" the company vehicle. [Filing No. 61-1 at 9.] The Policy requires employees to return the company vehicle in good condition; for example, it prohibits using the company vehicle to "[t]ransport[] pets or other animals," [Filing No. 61-1 at 7], and makes it "the driver's responsibility to ensure the company provided vehicle is clean and in good repair at the time of turn-in." [Filing No. 61-1 at 9.] Additionally, the Policy spells out negative consequences for violating its rules. It states that the "[f]ailure to comply with the maintenance guidelines and returning [a] vehicle[] with unreported damage may result in disciplinary action up to separation from the company." [Filing No. 61-1 at 11.] So regardless of the extent of damage, as long as any damage is unreported, that is a ground for "separation from the company." [Filing No. 61-1 at 11.]

  **B. Lilly Hires Mr. German and Grants Him Access to a Company Vehicle**

Lilly first hired Mr. German in 2004 as a sales representative in Seattle. [Filing No. 59-2 at 7.] Since that time, Lilly promoted Mr. German multiple times to a "series of management positions, including neuroscience trainer, cardiovascular trainer, district sales manager, senior district sales manager and biomeds field reimbursement director." [Filing No. 75 at 13 (citing Filing No. 59-2 at 11-12, 17-18, 21, 28).] Prior to the allegations of misconduct, Mr. German "had not received any discipline" and had "met performance expectations each year." [Filing No. 75 at 13 (citing Filing No. 74-5 at 19).] By 2018, Mr. German worked in a job position for which he was assigned a company vehicle (the "company vehicle"). [Filing No. 60-3 at 7.] In using the vehicle, Mr. German was required to abide by the vehicle Policy. [Filing No. 61-1.]

  **C. Lilly Hires Mr. German into a New Role Not Permitting the Use of a Company Vehicle**

Mr. German applied internally at Lilly for the new job of "Advisor of Business Transformation." [Filing No. 59-2 at 33-35.] In March 2021, he was interviewed by Associate Vice President – Business Transformation Patrick Lenihan ("Vice President Lenihan"), who

4

offered Mr. German the job, for which he worked remotely from home. [Filing No. 43-3 at 2; Filing No. 59-1 at 4.] The job was not a field-based position, so Mr. German was no longer entitled to a company vehicle. [Filing No. 59-2 at 98-99.] But Mr. German states that because he was tasked with "transitioning his duties from his old position in business reimbursement for (2) weeks from approximately April 1st, 2021-April 13, 2021, . . . he still made field calls." [Filing No. 75] (citing Filing No. 59-2 at 94-95).] Mr. German began his new job on April 12, 2021. [Filing No. 59-2 at 92.]

    D.  **Mr. German Continues Using the Company Vehicle after Entering New Role**

The next day, on April 13th, 2021, Mr. German called the Fleet Management Company to say that he had transferred to a new position and would need to return his company vehicle. [Filing No. 59-2 at 121; Filing No. 74-3 at 8-9.] Because the company vehicle's windshield was chipped, he asked the Fleet Management Company whether he should get the window fixed before returning the company vehicle. [Filing No. 59-2 at 120; Filing No. 74-3 at 8-9.] The Fleet Management Company told him to fix the windshield first and wait for further instructions on returning the company vehicle. [Filing No. 59-2 at 120; Filing No. 74-3 at 8-9.] By early May 2021, a repair company individual visited Mr. German's home to inspect the company vehicle; later, Mr. German brought the company vehicle on-site to the repair company. [Filing No. 59-2 at 120-21.] To get to and from the repair company, Mr. German used the company credit card for rideshare transportation. [Filing No. 59-2 at 124-129]. On May 27, 2021, Mr. German picked up the company vehicle from the repair company. [*See* Filing No. 59-2 at 124-27.] Vice President Lenihan noticed that Mr. German had charged rideshare fees to the company credit card, leading him to question Mr. German about "why he still had a company vehicle." [Filing No. 62 at 7] (citing Filing No. 59-3 at 2).]

5

### E. Lilly Investigates Misuse of Company Resources and Terminates Mr. German

On or about June 25, 2021, Fleet Manager Kim Cregar informed Associate Director — HR Investigations & Screening Nikki Holton ("Associate HR Director Holton") that Mr. German did not timely return his company vehicle. [Filing No. 59-1 at 3.] Associate HR Director Holton initiated an investigation. [Filing No. 59-1 at 3.] Later that week, on June 30, she interviewed Mr. German, who revealed that he "still had the company vehicle[,] that he had been using the gas card, and had been using the vehicle for personal miles only." [Filing No. 59-1 at 3.] Mr. German allegedly informed Associate HR Director Holton that "he was giving Lilly 'grace' to schedule the pickup." [Filing No. 59-1 at 3.] Associate HR Director Holton "investigated Mr. German's claim that he had contacted Lilly in April 2021 to return the vehicle," but there was no record of the call to either directly to Lilly at its fleet services or to the Fleet Management Company. [Filing No. 59-1 at 3.] The next day, on July 1, she sent Mr. German written questions asking whether Mr. German had "written evidence in the form of an email or a call log showing that he had called in April to return the vehicle." [Filing No. 59-1 at 4.] According to Associate HR Director Holton, he did not. [Filing No. 59-1 at 4.] But according to Mr. German's phone records, he did. [*Compare* Filing No. 74-3 at 8-9 (showing a call made to phone number 888-928-8354), *with* Filing No. 61-1 at 4 (showing Fleet Management Company's phone number 888-928-8354).] Associate HR Director Holton and Vice President Lenihan later "interviewed Mr. German a second time," and during that conversation, "Mr. German confirmed that he had continued to use the company vehicle for personal purposes and charge fuel on his company card." [Filing No. 59-1 at 5.] On July 12, 2021, Mr. German finally returned the company vehicle. [Filing No. 59-1 at 22.]

Associate HR Director Holton's investigation revealed that even after Mr. German started his new job, he "drove a total of 4,086 miles despite working from home and having no field responsibilities," "charged $645.64 using the Lilly credit card for fuel," and incurred $1,164.82 in

6

windshield repair costs. [Filing No. 59-1 at 4; Filing No. 60-4 at 8-11 (fuel costs); Filing No. 60-3 at 14-17 (mileage); Filing No. 60-5 at 6 (repair costs).][1] When the vehicle was returned, it was in an unclean condition with unreported damage, including "four deep door dings," "rear bumper scratches," "other minor scratches," a "large hole in [the] driver's side mat," "pet hair," and "seat stains." [Filing No. 59-1 at 4, 22.] The car was, according to its bill of lading, "dirty inside and out." [Filing No. 59-1 at 22.]

Associate HR Director Holton reported her findings to her supervisor, and also to Vice President Lenihan, who conferred together about "possible discipline." [Filing No. 59-1 at 5; Filing No. 43-3 at 3.] Vice President Lenihan further conferred with Lilly's Vice President/Chief Customer Officer Jen Oleksiw, "regarding possible discipline." [Filing No. 43-3 at 3.] Together, they concluded that "Mr. German had misused company resources (vehicle and money) for his own personal use and benefit by not returning it after transitioning into a non-field-based position and returned the vehicle with notable damage." [Filing No. 43-3 at 3.] They considered "the fact that Mr. German was in a leadership position to be an aggravating factor." [Filing No. 43-3 at 3.] Vice President Lenihan understood that in "similar cases Human Resources had investigated in the past," the result was "termination." [Filing No. 43-3 at 3.] For example, when a Caucasian woman failed to return her company vehicle when she moved into a position that did not authorize a company vehicle, Lilly terminated her. [Filing No. 59-1 at 5.] Likewise, when an African American employee also failed to return her company vehicle when she moved into a position that did not authorize a company vehicle, Lilly terminated her. [Filing No. 59-1 at 5.] Based on those

---

[1] According to Lilly's submitted mileage report, the month Mr. German began his new job, in April 2021, the company vehicle was driven 1,247 miles; in May 2021, it was driven 1,542 miles; in June 2021, it was driven 0 miles; and in July, no mileage appears in the report. [Exhibit E: Filing No. 60-3 at 14-17.] Per these numbers, the company vehicle was driven over 2,789 miles, not the over-4,000 miles Lilly claims.

7

considerations, Lilly concluded that the appropriate sanction for Mr. German's conduct was termination. [Filing No. 43-3 at 3.] On July 28, 2021, Lilly terminated Mr. German's employment. [Filing No. 59-1 at 5.]

### F. Mr. German Sues for Discrimination and Retaliation

Mr. German later filed a Charge of Discrimination with the Equal Employment Opportunity Commission, which issued him a right-to-sue letter. [Filing No. 74-5 at 6 (right-to-sue letter); 11-12 (charge).] Mr. German then timely filed suit in this Court, claiming Title VII race discrimination, Section 1981 discrimination, disability discrimination, disability retaliation, and age discrimination. [Filing No. 7 at 5-7.] He did not file a Statement of Claims. [*See* Filing No. 62 at 11.] After Lilly moved for summary judgment, Mr. German received three extensions of time to file his response to Lilly's Motion for Summary Judgment. [Filing No. 76.] When he filed his response to Lilly's Motion for Summary Judgment, he has stated in a footnote that he "is proceeding solely on his [Title VII] race discrimination claim" and "does not proceed upon his claims for disability discrimination . . . disability retaliation . . . , and age discrimination . . . and these counts may be dismissed accordingly." [Filing No. 75 at 1 n.1]. Pursuant to Mr. German's waiver, the Court **DISMISSES WITH PREJUDICE** Mr. German's claims of Section 1981 race discrimination, disability discrimination, disability retaliation, and age discrimination and **DENIES AS MOOT** Lilly's Motion for Summary Judgment, [59], as to those claims.

The Court thus focuses its discussion solely on Mr. German's claim for Title VII race discrimination.

### III.
### DISCUSSION

Lilly argues that Mr. German "was not meeting Lilly's Legitimate Expectations" in that "despite being aware of his obligation to do so, [Mr. German] failed to return his company-

provided vehicle to Lilly once he transitioned to his new job and that he continued to drive the company-provided vehicle in violation of [the] Fleet Policy." [Filing No. 62 at 13.] Lilly argues that it did not treat other similarly situated employees more favorably than Mr. German, and "[i]n fact, to the contrary, Lilly has terminated other employees outside of [Mr. German's] protected class for failing to return a company vehicle." [Filing No. 62 at 14.] Lilly argues further that Mr. German "presents no evidence of pretext." [Filing No. 62 at 18.] Lilly argues that he "cannot overcome the same decisionmaker inference," which is the presumption that "[w]here the same manager both hires and takes adverse action against an employee in a relatively short period of time, it is highly doubtful that the adverse action is the result of a sudden aversion to members of the employee's protected group." [Filing No. 62 at 18.] Lilly argues that it "was aware of [Mr. German's] race . . . when it" "promoted him numerous times," then "hired him into the Business Transformation role" and then fired him four months later. [Filing No. 62 at 18.] Lilly argues that after "conduct[ing] a thorough investigation," it honestly believed it "had a legitimate, non-discriminatory reason for Mr. German's termination — his multiple violations of the Fleet Policy." [Filing No. 62 at 19.] According to Lilly, its investigation concluded that Mr. German had not actually tried to return the vehicle as he claimed, found "no evidence to support [Mr. German's] claim that he had contacted" the Fleet Management Company directly to return the company vehicle, that Mr. German "admitted . . . he continued to use [the company vehicle] for personal purposes," that he "charge[d] Lilly for repair and fuel until his supervisor questioned why he still had a company vehicle in his new job," that he "signed a bill of lading confirming that he returned the vehicle with visible body damage that he never reported to Lilly," and that as a "leader in the company," he was "well aware of the Fleet Policy" and "had been responsible for enforcing . . . the policy," but still "misuse[d] . . . company property." [Filing No. 62 at 19-20.]

9

Mr. German responds that he "had a long history of outstanding performance. To the extent [Lilly] argues that Mr. German failed to meet its legitimate expectations, Mr. German's documented performance record refutes this allegation." [Filing No. 75 at 12.] He argues that "[n]othing in the records suggest that [Associate HR Director] Holton searched [the Fleet Management Company's] call records from April 2021 - June 2021. [Filing No. 75 at 3 (citing Filing No. 74-2 at 32).] He argues that "[s]imilarly-situated Caucasian employees were accorded more favorable treatment than" him. [Filing No. 75 at 13.] He argues that one Caucasian employee "was not disciplined at all after her spouse wrecked her company car while driving intoxicated." [Filing No. 75 at 15.] He also argues without specific individual identification that "multiple Lilly employees . . . had multiple DUI's, . . . [but] were not terminated. Further, Mr. German is not aware of any other employees terminated for violations of Fleet policy similar to his own alleged violation." [Filing No. 75 at 15.] As to another employee who was terminated, Mr. German states "her conduct was not the same as [his] conduct at all. The woman in question did not attempt to return her vehicle just (1) day after beginning her new role, as Mr. German did. In fact, she made no attempts whatsoever to return it for a period over (9) months between December 2020 and September 2021. In addition, she put over 8,000 unauthorized miles on the vehicle, used the company Amex card to pay for car washes, and she failed to respond to an email from HR in December 2020 to reach out to [the Fleet Management Company] to return the vehicle." [Filing No. 75 at 15.] He argues that in contrast to the noncooperation of another employee, "[t]he record is clear that Mr. German called [the Fleet Management Company] from his work cell phone on April 13th to inform them that he had transferred to a new position and would need to return his vehicle." [Filing No. 75 at 16]. Further, Mr. German states that "[i]t is not clear that Mr. German violated any of [Lilly's] Fleet Policies." [Filing No. 75 at 17.] As to charges on the company credit

10

card, Mr. German states that he was supposed to use the card for those purposes [Filing No. 75 at 5]. As to damage to the vehicle, he states that he did not own a pet animal, [Filing No. 75 at 8], and that after years of possession, wear and tear on the vehicle is to be expected, [Filing No. 75 at 18.] As to the process of returning the vehicle, he states, "there is nothing in [Lilly's] Fleet policy indicating Mr. German could not use the vehicle while he waited . . . for its pickup." [Filing No. 75 at 17-18.] He states that he was simply following instructions from the Fleet Management Company and the fact "that it took several weeks to get the windshield replaced by [the] approved vendor . . . is no fault of Mr. German." [Filing No. 75 at 17-18.] He states that during his transition to his new job, he did indeed make field calls which required use of the company vehicle. [Filing No. 75 at 7.] According to Mr. German, all this amounts to "[s]uspicious timing, along with [Lilly's] unexplained deviations from its established standards and contradictions in the record, [which would] allow a reasonable juror to conclude that Mr. German's protected characteristics motivated [Lilly's] action against him." [Filing No. 75 at 16.]

      Lilly replies that Mr. German "violated company policy and did not meet Lilly's legitimate expectations." [Filing No. 79 at 2.] Lilly states that even "after transitioning to a new role, he had driven the company vehicle over 4,000 miles, charged over $500 in fuel expenses to his Lilly fuel card and had a crack in the windshield repaired at a cost of $1,164.82, and returned the vehicle with damage that he failed to report, was not clean, and appeared to have been used to transport pets." [Filing No. 79 at 3.] Lilly disputes the implications of the fact that Mr. German "had transition responsibilities between April 1, 2021 and April 13, 2021," denying that Mr. German "still made field calls during that time as this contention is not supported by the record. While the record states that [Mr. German] still had calls for his business reimbursement position, it does not support that they were field calls which necessitated use of a company vehicle." [Filing No. 79 at

11

16-17.] Lilly states that Mr. German "fails to present evidence that similarly-situated individuals received more favorable treatment." [Filing No. 79 at 4.] Lilly states that a Caucasian employee "was not terminated for violating the Fleet Policy when her husband drove her company vehicle while intoxicated but – even assuming that these allegations are true – she is not an appropriate comparator.  [Mr. German] has admitted [in his deposition] that [she] did not violate the Fleet Policy and was not in the vehicle at the time." [Filing No. 79 at 4 (citing Filing No. 59-2 at 24-25)]. Lilly further argues that "[u]nnamed employees are not appropriate comparators." [Filing No. 79 at 5.] Lilly states that "the only appropriate comparator—a Caucasian employee who also did not return her company vehicle when she transitioned job duties—was in fact terminated." [Filing No. 79 at 6.]

In an employment discrimination case, "the sole question that matters [is] [w]hether a reasonable juror could conclude that [the employee] would have kept his job if he had a different [race], and everything else had remained the same." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 764 (7th Cir. 2016). In answering that question, courts often turn to the *McDonnell Douglas* burden-shifting framework, in which "a plaintiff must first establish a prima facie case for discrimination," *Vichio v. US Foods, Inc.*, 88 F.4th 687, 691 (7th Cir. 2023), which means demonstrating that (1) he is a member of a protected class; (2) his performance met the employer's legitimate, nondiscriminatory expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside his protected class were treated more favorably. *Singmuongthong v. Bowen*, 77 F.4th 503, 507 (7th Cir. 2023) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Afterwards, the Court turns to the employer for evidence showing that the employee failed to meet its legitimate expectations, at which point the employee must show that the employer's answer was a "pretext"; that is, "an attempt to mask a discriminatory

reason with a legitimate excuse.'" *Crain v. McDonough*, 63 F.4th 585, 593 (7th Cir. 2023). Where the employer's "legitimate expectations" and the employee's "pretext" allegations overlap, the Court can skip the prima facie analysis and directly address pretext. *Brooks v. Avancez*, 39 F.4th 424, 435 (7th Cir. 2022). This approach to the analysis aligns with the "'whole evidence' outlook espoused by" *Ortiz*. *Id.* (citing *Ortiz*, 834 F.3d at 764-65). Here, Lilly argues that it honestly believed that Mr. German violated its Fleet Policy, which would constitute falling short of Lilly's legitimate expectations. *See id.* (affirming summary judgment in favor of employer which honestly believed its employee was "refusing to follow company rules"). Consequently, the Court inquires directly into pretext.

The pretext inquiry evaluates "the honesty of the employer's explanation." *Crain*, 63 F.4th at 593. "[A]n employer's dishonest explanation," can itself "support an inference that its real reason was unlawful." *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 932 (7th Cir. 2020). At summary judgment, the inquiry evaluates whether the plaintiff has shown that "implausibilities, inconsistencies, or contradictions" render the employer's asserted reasons "unworthy of credence." *Parker v. Brooks Life Sci., Inc.*, 39 F.4th 931, 938 (7th Cir. 2022). As applied to an employer's investigation into employee misconduct, the pretext inquiry asks "whether [the employer] came to an honest conclusion about the situation based on the information uncovered by the investigation." *Hudson v. Wal-Mart Stores, Inc.*, 412 F.3d 781, 784 n.1 (7th Cir. 2005).

In Lilly's investigation, it evaluated Mr. German's conduct with respect to its Policy. Lilly gave Mr. German an opportunity to be heard, interviewing him twice about his conduct. Lilly claims it checked its records and determined that Mr. German did not call the Fleet Management Company to return the vehicle. Lilly reviewed the company vehicle's records, including its bill of lading that Mr. German signed, indicating that the vehicle had unreported damage. And

13

specifically, Associate HR Director Holton, Vice President Lenihan, and other decisionmakers conferred to determine whether the appropriate sanction was termination.  Lilly's explanation was neither "shifting" and "inconsistent," nor "opaque" and "nonexistent."  *Parker*, 39 F.4th at 938; *Bragg v. Munster Med. Rsch. Found. Inc.*, 58 F.4th 265, 272 (7th Cir. 2023).  While the Court's analysis is not a referendum on the investigation's thoroughness, from the evidence marshalled during summary judgment, no reasonable juror could conclude that the investigation and its conclusions were a sham.  Equally as important, there is no record evidence that Lilly's decision was motivated by race discrimination.

For his part, Mr. German states that Lilly was not thorough in its investigation, arguing that Lilly did not corroborate whether Mr. German actually called the Fleet Management Company.  For the purposes of summary judgment, the Court will assume that Mr. German did indeed make the proper phone calls and follow the proper instructions from the Fleet Management Company.  But the Court does not evaluate "whether [the employer] credited the witnesses that [the Court] would have credited or [the employee] would have credited."  *Hudson*, 412 F.3d at 784 n.1.  So Lilly was entitled not to believe Mr. German's story.  Mr. German argues that it is not clear that he violated the Policy.  Lilly may well have misinterpreted the Fleet Policy or misunderstood the facts in firing him, but "an employer's misinterpretation of a policy . . . is generally . . . evidence of pretext [only] where it is so far afield to be unworthy of credence."  *Crain*, 63 F.4th at 593.  Given Lilly's stated reasons, among them the unreported damage to the company vehicle, itself a firing offense, Lilly's Policy interpretation is hardly so far afield as to pose a genuine issue of material fact.  Mr. German notes also that for many years, he had an outstanding record; this, too, the Court assumes to be true, as Lilly previously did in promoting Mr. German, but "courts are not super-personnel departments who sit in judgment of management decisions," *Brooks*, 39 F.4th at 436, so

it does not matter that "an employer may be . . . too hard on its employee." *Harper v. C.R. England, Inc.*, 687 F.3d 297, 311 (7th Cir. 2012). All that matters is the sincere beliefs of the decisionmaker, "not anyone else." *Parker*, 39 F.4th at 940.

## IV.
### CONCLUSION

Ultimately, of the many kinds of circumstantial evidence – like "suspicious timing", "ambiguous statements," "implausibilities," "inconsistencies," or "contradictions" – Mr. German has not offered any evidence from which a reasonable jury could conclude that Lilly's reason for terminating him was a pretext. *Parker*, 39 F.4th at 937; *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 380 (7th Cir. 2020). In fact, he shows "nothing in the record suggest[ing] that race ever came up, directly or indirectly," when he was terminated. *Groves v. S. Bend Cmty. Sch. Corp.*, 51 F.4th 766, 769 (7th Cir. 2022). Mr. German's lack of evidence practically amounts to a guess of Lilly's supposedly hidden intentions, but "[g]uessing at an employer's hidden animus or inner prejudice, . . . is not enough to defeat summary judgment. The employee must support [his] hunch with evidence." *Brooks*, 39 F.4th at 436. Mr. German "did not clear this hurdle." *Groves*, 51 F.4th at 770. At bottom, "an employee can be terminated for violations of valid work rules that apply to all employees," which in this case Lilly honestly believed Mr. German violated. *Pernice v. City of Chi.*, 237 F.3d 783, 785 (7th Cir. 2001). Whether under the *McDonnell-Douglas* burden-shifting framework or the *Ortiz* whole-evidence analysis, in this case, "as is often true," there is simply a lack of pretext. *Brooks*, 39 F.4th at 435. Consequently, the Court **GRANTS** Lilly's Motion for Summary Judgment, [59], on Mr. German's Title VII race discrimination claim. Further, the Court **DENIES AS MOOT** the Motion for Summary Judgment as to Mr. Mr. German's Section 1981 race discrimination, disability discrimination, disability retaliation, and age discrimination claims and **DISMISSES** those claims **WITH PREJUDICE.** Final judgment shall enter accordingly.

Date: 6/20/2024

*[Signature: Jane Magnus-Stinson]*

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

Chad M. Buell
Employment Law Office of John H Haskin & Assoc LLC
cbuell@jhaskinlaw.com

John H. Haskin
JOHN H. HASKIN & ASSOCIATES, LLC
jhaskin@jhaskinlaw.com

Michael Ross Phillips
McGuireWoods LLP
mphillips@mcguirewoods.com

Melissa M. Weiss
McGuireWoods LLP
mweiss@mcguirewoods.com